IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM C. COX, INC. | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| TOTAL SITE IMPROVEMENTS, LLC, | : | No. 15-4068 |
| Defendant. | : | |

### MEMORANDUM OPINION

**TIMOTHY R. RICE**                                                                                                                  **April 28, 2016**
**U.S. MAGISTRATE JUDGE**

      This is an unfortunate dispute between two small businessmen over delayed payments under two subcontract agreements. In early December 2014, Plaintiff William C. Cox, Inc. ("Cox") and Defendant Total Site Improvements, LLC ("TSI") entered into subcontract agreements for site work ("Site Work Contract") and concrete work ("Concrete Contract") at the Colgate Palmolive Company ("Colgate") site in Burlington, New Jersey. See Pl. Exs. 6, 17. The parties dispute who breached the subcontracts first and whether Cox's failure to pay certain invoices on time excused TSI from abandoning the job weeks before the contracts were terminated. A trial occurred April 12 through April 14, 2016, and the parties have agreed to a binding, non-appealable verdict.

      Although both sides share some blame, TSI breached the subcontracts first when it walked away from work on the Colgate site, and then refused to engage in attempts to resolve the dispute. For the following reasons, I will enter judgment in favor of Cox for $173,043.23, plus the additional costs and fees incurred between April 1, 2016 and the end of trial.

I.      Law

The parties agree New Jersey law applies.[1]  TSI relies on Zulla Steel, Inc. v. A & M Gregos, Inc., 415 A.2d 1183 (N.J. Super. 1980), in which the court held a subcontractor was justified in terminating performance after a prime contractor had breached a subcontract by failing to making timely progress payments over the course of several months.  Zulla Steel, Inc., 415 A.2d at 1187.  The court noted that although it did "not suggest that every delay in payment will justify a contractor in terminating performance under an installment contract, here there was a substantial underpayment for a prolonged period of time."  Id.  Cox relies on C.A.S. Contr., Inc. v. Hall Bldg. Corp., 2005 WL 3742269 (N.J. Super. 2006), in which the same court found the subcontractors had improperly abandoned their work without notice.  2005 WL 3742269, at *12.  The court distinguished Zulla's "substantial delinquencies in payments[] over a prolonged period of time" with the "relatively little money" due to the subcontractors in that case.  Id.

II.     Contracts

The Site Work Contract provides that TSI would receive $459,492.00 from Cox for labor, material, and equipment for certain site work and improvements.  Pl. Ex. 6 at 1-2.  The Concrete

---

[1]     Cox argues N.J. Stat. § 2A:30A-2, which sets forth non-payment procedures and remedies to contractors, applies to this case, and that under that statute, TSI did not follow the proper procedures to make a claim of nonpayment and suspend performance.  See 4/15/2016 Letter from McCabe.  Cox further argues the statute provides it an additional remedy.  Id. (citing N.J. Stat. § 2A:30A-2(b)).  However, because TSI did not pursue a cause of action under the New Jersey statute, the statute's notice provision does not affect TSI's claim of nonpayment, nor does it provide additional remedies to Cox.  See, e.g., Aire Enterprises, Inc. v. Warren County, 2014 WL 5419568, at *1 (N.J. Super. Ct. Oct. 27, 2014); Structural Steel Fabricators, Inc. v. Consol. Sys., Inc., No. A-0445-09T3, 2010 WL 4608232, at *2 (N.J. Super. Ct. Nov. 16, 2010) (plaintiffs alleged violations of N.J. Stat. § 2A:30A-2); Shore Mech. Contractors, Inc. v. W.G. Osborne Const., L.L.C., No. A-1796-07T3, 2008 WL 4107985, at *1 (N.J. Super. Ct. Sept. 8, 2008) (plaintiff claimed breach of contract pursuant to N.J. Stat. § 2A:30A-2).

Contract provides that TSI would receive $332,400.00 from Cox for certain concrete work and improvements. See Pl. Ex. 17 at 1-2. The payment terms for each subcontract were 45 days from the date an invoice was issued, conditioned upon Colgate's payment to Cox for the invoiced work. Pl. Exs. 6 & 17 at 2, ¶5. Cox was permitted to retain ten percent of the value of the labor performed at the time of payment, to be issued to TSI with the final payment. Id.

Under the subcontracts, TSI was required to "supply sufficient materials, workers and equipment to maintain the progress of the work to the satisfaction of [Cox] and perform the same at such times and places as designated by [Cox], and [could] not damage, delay or otherwise interfere with the work of [Cox] . . . ." Id. at 4 ¶ 9. Because they were "[t]ime is of the essence" contracts, any breach would "go to the essence thereof," and TSI, in agreeing to complete the work within the provided timeframe, took "into consideration and made allowances for all the hindrances and delays incident to the work." Id.; see also id. ¶ 10(b) ("Time of completion of the work under this [contract] is of the essence."); Pl. Ex. 17 at 1 ("The concrete scope for this project is pivotal and must be completed per the construction schedule or sooner . . . ."). Further, TSI's "prompt payment" to all of its subcontractors and suppliers was "of the essence." Id. at 5 ¶ 13. To make changes on the work to be performed, TSI was required to obtain Cox's prior written consent. Id. at 5 ¶ 15.

In the event that TSI delayed the progress of the work or "furnishing of materials," or failed to make prompt payment to its sub-subcontractors or suppliers, TSI could be deemed in default under the subcontract agreements. Pl. Exs. 6 & 17 at 4 ¶ 10. The contracts required Cox to provide three working days' written notice to TSI to cure its actions giving rise to the default before Cox could exercise its remedies. Id. After providing notice, Cox could cancel the subcontract, take possession of TSI's materials and equipment left on the jobsite, and complete

the work "by whatever method [Cox deemed] expedient." Id. at 4 ¶ 10(b). TSI would not be entitled to receive further payments until the principal contract work was completed. Id. However, if the costs and expenses to complete the work, including "reasonable" overhead, profit, and attorney's fees, exceeded the unpaid balance due to TSI, TSI was not entitled to the balance and instead assumed entire responsibility for the excess costs. Id.

> III.   Breach

At the beginning of the Colgate project, Cox issued two large advanced payments to TSI for work that had not yet been completed. Pl. Exs. 8, 9, 69; Def. Ex. 73. Cox also paid the majority of TSI's February invoice, and fully paid a March 20 invoice. Def. Ex. 73. However, in early June, TSI began to voice its concern with overdue invoices and its inability to pay suppliers for materials.

On June 4, 2015, TSI emailed Cox, requesting payment on four invoices. Def. Ex. 24. Sue Cox replied that Cox would be receiving a payment from Colgate on June 18 and at that time, Cox would pay TSI. Id. On June 8, TSI again emailed Cox, reiterating TSI's need for payment on overdue invoices in order to pay for materials, and again, Sue Cox replied that Cox was expecting payment from Colgate on June 18. Def. Ex. 26. In response, TSI repeated it was unable to order any materials until it received payment from Cox, and Sue Cox responded that she would pass that information on to Brad Czechowski, Cox's project manager. Def. Ex. 27. TSI, however, did not claim Cox had breached the contracts.

TSI last worked on the Colgate site on June 8, 2015, with the exception of returning on June 12 to complete four hours of work that did not require purchased materials. See Thomas Chamberlain Dep. at 43-44. After leaving the jobsite, TSI ceased to communicate with Cox or further explain its absence.

As of June 8, 2015, TSI had completed $191,240.45 worth of site and concrete work, including base and change order work, for which they were due payment by Cox.[2] See Pl. Ex. 69. Cox had paid TSI for the initial two "advanced" invoices for base site work, one invoice for change order site work (#1673), and part of another invoice for change order site work (#1662), totaling $187,185.84. Pl. Exs. 8-10, 12 (invoices); id. 16 (chart); id. 23 (6/15/15 TSI email stating total paid to date); Def. Ex. 73. Thus, on June 8, 2015, Cox owed TSI $4,054.61.[3]

On June 12, 2015, Czechowski emailed TSI with a breakdown of money paid and owed by Cox, acknowledging $18,841.00 was due as of June 8. Pl. Ex. 54. In a June 15 email, TSI requested $54,106.43 in payments, noting five overdue invoices (## 1662, 1676, 1679, 1683, and 1689). Def. Ex. 29. Czechowski approved payment of all five invoices. Id. He also approved a $51,885.00 payment in a June 12, 2015 concrete invoice (#1699). Def. Ex. 30.

In June, TSI missed and avoided critical opportunities for dialogue that could have resolved this matter.[4] In a June 16, 2015 email, Czechowski told Chamberlain they needed to

---

[2]   Cox asserts TSI performed only $175,079.81 worth of work as of June 8, 2015. See Pl. Ex. 69. However, I have replaced the ten percent retainage that Cox subtracted after-the-fact from the advanced payments (Invoice ## 1645 & 1657), "RCA in lieu of bank run" line item (part of invoice #1662), and Invoice #1673, which was not deducted in those invoices. I also added $11,392.50 for the fire service in Invoice #1657, see infra at 9, and included $20,341.40 for base work from Invoice #1679, but excluded change order work in Invoice ##1676 and 1679, for which payment had not yet been received from Colgate. See Pl. Ex. 69.

[3]   Two other concrete invoices (#1683 and 1689) were due on June 12, 2015 and June 16, 2015, respectively, after the date TSI walked off of the jobsite. Pl. Exs. 16, 18-20; Def. Ex. 73. A third concrete invoice (#1699) was due in July. Pl. Ex. 20-21.

[4]   TSI's failure to show up at the jobsite and communicate with Cox appears to have been a recurring issue. In a March 30, 2015 email to TSI, Czechowski noted, "The sun is shining and nothing is happening, it makes us look bad. We need to be here tomorrow." Pl. Ex. 26. It appears there was no response from TSI, and when asked whether TSI was present at the jobsite on March 30, Tom Chamberlain, TSI's principal responded, "I don't know." Chamberlain Dep. at 150. On May 19, 2015, Czechowski emailed Chamberlain to confirm that TSI would be on the Colgate jobsite the next morning, noting Cox was "very disappointed that [it had] lost the last (2) days because forms were not delivered to the site which is unacceptable. Even more

5

meet regarding Colgate, and asked Chamberlain to confirm that he would come to a meeting on June 18. Pl. Ex. 32. Chamberlain failed to show up at the meeting because he was at another jobsite on June 18, see Chamberlain Dep. at 216, and extremely frustrated by the contentious relationship with Cox. See Trial Testimony. Nevertheless, Chamberlain's unresponsiveness to emails, and his failure to attend the June 18 meeting, reinforced his abandonment of the Colgate site, and ultimately justified Cox's further withholding of payment.

On June 23, 2015, Cox sent a notice of termination to TSI, pursuant to paragraph ten of the subcontract agreements. Pl. Ex. 33. On June 27, 2015, the day TSI received the notice, it stated in an email to Cox that it was "preparing a mechanics lien." Pl. Ex. 36. On June 30, 2015, Cox sent a letter of cancellation of the subcontract agreements to TSI, noting TSI had not attempted to cure the problems and that all further payment to TSI would be suspended. Pl. Ex. 34. The subcontracts were terminated on June 30.

Both parties had multiple opportunities to cure the problem: Cox by payment and TSI by communication. Cox owed TSI only a minimal amount ($4,054.61) on June 8, when TSI breached the contract by abandoning a job it had promised to perform. See C.A.S. Contr., Inc., 2005 WL 3742269 at *8 (subcontractor "breached . . . by abandoning work and failing to follow contractual procedure to resolve disputes over progress payments" because "amounts in dispute were small, within industry standards" and the general contractor "did not withhold substantial payment"). However, by June 18, when Cox received $612,191.96 from Colgate, see Pl. Ex. 5, Cox owed TSI an additional $26,465.13. See Pl. Ex. 16. Thus, Cox had the opportunity to

---

concerning is the fact that nobody called me to let me know. Delays like this cannot happen again." Pl. Ex. 27. Czechowski requested a two-week schedule of activity from TSI to "alleviate such delays." Id. Two days later, Czechowski emailed Bill Cox, stating he had not yet received TSI's schedule. Pl. Ex. 28. The following Monday, May 25, Bill Cox emailed Chamberlain, asking him why he had not yet submitted his schedule. Pl. Ex. 29. Chamberlain ignored Cox's request.

mitigate its damages by paying TSI, which could have presumably resumed work. See Harvard v. Bushberg Bros., Inc., 350 A.2d 65, 68 (N.J. Super. Ct. 1975) (wronged party in contract dispute required to mitigate damages).

Although both parties were in breach, neither party exercised its remedies under the contracts by providing written notice of default until Cox notified TSI on June 23, 2015. See Pl. Ex. 17, Concrete Subcontract, at 4 ¶ 10. While owed money throughout June, TSI failed to invoke its remedies under the subcontract agreements or provide adequate notice to Cox under New Jersey law. See, e.g., Pl. Ex. 17, Concrete Subcontract Agreement at 6 ¶ 26 (in the event of contractor delays, subcontractor may request extension of time to complete work in writing within five days of the commencement of such delay); N.J. Stat. § 2A:30A-2 (after providing seven days' written notice to party failing to make requirement payments, subcontractor may suspend performance of construction contract without penalty). Moreover, instead of replying to Cox's notice of termination letter productively, TSI threatened to file a mechanic's lien. Pl. Ex. 36.

Cox, however, attempted to meet with Chamberlain the day after receiving payment from Colgate. Pl. Ex. 32. TSI could have returned to the Colgate project and received payment, but elected to remain at its other jobsite. The contracts did not permit TSI to abandon the job because of delay in payments.[5] Cox's attempt to communicate with Chamberlain to no avail justified its decision to withhold payment.

The crux of TSI's argument is that TSI stopped showing up at the jobsite only because it could not afford the materials (evidenced by the fact that it returned to the job site on June 12 to

---

[5] In fact, the only remedy available to TSI under the contracts was an extension of time for completing work in the event of prime contractor delay. See Pl. Ex. 17, Concrete Subcontract, at 6 ¶ 26. However, to exercise that remedy, TSI was required to request an extension of time in writing within five working days of the commencement of the delay. Id.

7

conduct work that required only manual labor), and that once Cox received the Colgate payment on June 17, it could have paid TSI, which would have resumed work. This position ignores the fact that TSI was no longer performing work and refusing to communicate to remedy the business dispute.

TSI also argues Czechowski acknowledged in his June 12 email that Cox owed TSI $18,841.00 as of June 8. See Pl. Ex. 54. In fact, Czechowski reduced that figure to $7,903.00 after considering retainage not withheld, and noted TSI had abandoned an $800,000.00 project over that small amount. Id. Czechowski stated Cox's lack of payment was not an excuse for TSI to abandon the project, and that he expected TSI to return to the site. Id.

Regardless of Czechowski's calculations, TSI failed to maintain a dialogue with Cox to address its financial issues, and, therefore, cannot justify its breach due to the nominal amount owed on June 8. TSI was aware Cox would receive a large payment on June 18 to cover its materials, but it could not expect Cox to be forthcoming with payment when it walked off the jobsite and ceased communication.

TSI knowingly entered into a subcontract that apparently was beyond its financial capabilities and inconsistent with its thirty-day subcontracts with suppliers. See Chamberlain Dep. at 21-22. Although Chamberlain testified that, based on verbal assurances, he expected payment every 15 days following the 45-day delay after an invoice submission, he failed to follow this schedule himself by not submitting invoices every 15 days. See Def. Ex. 73 (chart of invoices submitted). Moreover, in light of the contract provisions apprising TSI of the payment terms, as well as Cox's large advanced payment, there is no justification for TSI's own delay in work.

IV.     Damages

Cox seeks approximately $226,765.73 in damages, including: 1) $132,494.75 in excess costs to complete the concrete work; 2) $85,075.03 in excess costs to complete the site work; 3) $32,635.47 in 15% overhead and profit markup on excess costs; 4) $10,854.84 in delay costs; and 5) $46,681.25 in attorney's fees, as of the date of trial.[6]  Cox argues that an implied right to withhold money due existed after June 8, 2015, when TSI was in breach.  The contract, however, provided no remedy to Cox until it provided notice of breach on June 23, 2015.  In addition, I must determine how much money TSI should receive for unapproved change orders and other work the parties agree TSI performed because Cox was enriched by that work.  See Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC, 921 A.2d 1100, 1108 (N.J. 2007) ("Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract."); see id. (the goal of contract damages is to "put the injured party in as good a position as ... if performance had been rendered").

The parties generally agree the figures presented at trial are accurate, but dispute the overall damages.

**Site Work**

TSI performed $221,753.39 worth of site work.  See Pl. Ex. 1 at 7.  Cox seeks to withhold payment for incomplete work for the fire service and earthwork.  Id.  However, testimony revealed TSI had in fact completed a portion of the fire service, Chamberlain Dep. at 56, as well as completed nearly all of the earthwork, id. at 64.  Thus, I will add TSI's proposed value for the fire service and earthwork, and find that TSI performed $157,054.20 worth of base

---

[6]     TSI does not dispute the fee petition amount.  Pursuant to the subcontracts, Cox is entitled to attorney's fees.  See Pl. Ex. 17 at 4 ¶ 10(b).  Cox should submit a revised fee petition based on work performed during the trial within seven days of this Opinion.

site work.

Cox also seeks to withhold payment for the leak detection and paver removal change orders, totaling $5,800.00, because they were not officially approved.  See Pl. Ex. 1 at 7.  However, TSI has provided receipts for materials associated with this work, see Def. Ex. 39, and it is unlikely TSI would have gone forth with that work if not verbally approved by Cox.  Further, it is clear Cox benefited from the leak detection and paver work, and GeoTech was onsite monitoring the project.

**Concrete**

Cox seeks to withhold payment for all concrete change orders except for Invoice #1689 for $1,586.26.  See Pl. Ex. 1 at 8.  Cox disputes four concrete change orders for footing, excavating footing, dewatering on April 20, 2015, and dewatering on May 8, 2015 because its payment to TSI was dependent on Colgate's payment to Cox.  See id.; Def. Exs. 44, 47, 49.  Cox also disputes concrete change orders for removal of concrete and "cut & weld nuts."  Pl. Ex. 1 at 8; Def. Ex. 43.  However, the evidence showed Cox benefited from that change order work and upon Colgate's June 17 payment to Cox, Cox owed TSI for those change orders.  Thus, Cox owes TSI $31,991.26 in change orders.

Cox further disputes concrete change orders for surveyor downtime and reinstallation of rebar due to bad layouts, Pl. Ex. 1 at 8; Def. Exs. 46, 48.  There is no evidence those change orders were authorized, and, in fact, it is clear TSI submitted them only after abandoning the job and the business relationship was in jeopardy.  There is also no evidence Cox was unjustly enriched by the contents of those change orders.  Cox also disputes the concrete change order for forms left on site used by Cox.  Pl. Ex. 1 at 8; Def. Ex. 45.  However, once the subcontract was canceled, Cox was permitted to take possession of TSI's materials and equipment left on the

jobsite to complete the work.  See Pl. Ex. 17, Concrete Subcontract at 4 ¶ 10(b).

The parties agree TSI performed $76,250.00 worth of base concrete work.  See Pl. Ex. 1 at 8.  Thus, the total value of work TSI completed on concrete work is $108,241.26.

**Total**

To date, Cox has paid TSI $195,296.54.[7]  See Pl. Ex. 1 at 9.  TSI has completed $221,753.39 worth of site work and $108,241.26 worth of concrete work, totaling $329,994.65.  Cox, therefore, owes TSI an additional $134,698.11 for work completed.  However, TSI owes Cox for excess costs, overhead and profit markup, delay costs, and attorney's fees, or approximately $307,741.34 plus additional attorney's fees through April 2016.[8]  TSI, therefore, must pay $173,043.23, plus additional attorney's fees for work from April 1, 2016 to the end of trial on April 14, 2016.

An appropriate Order follows.

---

[7] After June 8, 2015, Cox paid TSI an additional $8,111.00 on June 23, 2015.  See Pl. Ex. 1 at 9.

[8] TSI does not challenge Cox's calculations for those damages.